1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

JENNIFER C. PETERSON,       )   1:07cv01819 DLB
                       )
                       )
            Plaintiff,   )   ORDER REGARDING PLAINTIFF'S
                       )   SOCIAL SECURITY COMPLAINT
                       )
     v.                  )
                       )
MICHAEL J. ASTRUE, Commissioner )
of Social Security,          )
                       )
            Defendant.  )
                       )
_____)

## BACKGROUND

     Plaintiff Jennifer C. Peterson ("Plaintiff") seeks judicial review of a final decision of the

Commissioner of Social Security ("Commissioner") denying her application for disability

insurance benefits pursuant to Title II the Social Security Act.  The matter is currently before the

Court on the parties' briefs, which were submitted, without oral argument, to the Honorable

Dennis L. Beck, United States Magistrate Judge.[1]

## FACTS AND PRIOR PROCEEDINGS[2]

     Plaintiff filed her initial application on May 24, 2004, alleging disability since June 1,

2002, due to bipolar disorder and depression.  AR 53-56, 59-68.  After her application was

---

[1] The parties consented to the jurisdiction of the United States Magistrate Judge.  On April 17, 2009, the action was reassigned to the Honorable Dennis L. Beck for all purposes.

[2] References to the Administrative Record will be designated as "AR," followed by the appropriate page number.

denied initially and on reconsideration, Plaintiff requested a hearing before an Administrative

Law Judge ("ALJ").  AR 30-34, 36-40, 41.  ALJ Peter Belli held a hearing on April 5, 2006, and

issued an order denying benefits on August 17, 2006.  AR 60-69, 506-529.  On October 18, 2007,

the Appeals Council denied review.  AR 5-8.

Hearing Testimony

ALJ Belli held a hearing on April 5, 2006, in Sacramento, California.  Plaintiff appeared

with her attorney, Dennis Cameron.  Vocational expert ("VE") Jim Van Eck also appeared and

testified.  AR 285.

Plaintiff testified that she was 35 years old at the time of the hearing.  She lived in a

house with her husband and four children, ages 13, 11, 8 and 6.  AR 290-291.  Plaintiff graduated

high school and last worked briefly in 2002, at a florist.  AR 292, 309.  Plaintiff could not

continue working because it became "too much" and she started missing too much work.  AR

306.

Plaintiff explained that she could no longer work because she gets confused and has a

hard time reading and writing because of her medications.  AR 294.  Plaintiff takes 300 mg of

Lamictal, 300 mg of Wellbutrin and .75 mg of Synthroid during the day, and 100 mg of Seroquel

and 25 mg of Xanax at night.  AR 294-295.  She also feels that "life is too big," but isn't sure if

that is from the medication or the bipolar disorder.  AR 296.

Plaintiff further testified that she stopped drinking alcohol two years and four months ago

and is currently in AA.  She is a sponsor and goes to meetings once or twice as week.  She has

also conducted meetings in the past.  AR 297.  Plaintiff has a valid driver's license and drives

almost everyday.  AR 298.

When asked about her medical problems, Plaintiff explained that she was bipolar and

cycles three to four times a week.  AR 299.  She described her cycles as "rapid," meaning that

she experiences depression and mania "sometimes in one day, or a couple days."  AR 306.  She

was hospitalized most recently in October 2005 because she was suicidal.  In 2004, she was

hospitalized because she was suicidal and was suffering from depression and mania at the same

time.  In 2002, she was hospitalized in both April and July.  AR 300.  Plaintiff currently sees a therapist once every three weeks to "get her life in order."  AR 301.

Plaintiff testified that she was not hospitalized in 2003.  During that year, her mother, sister and mother-in-law helped her take care of her children, though they did not spend all day with her.  She was the sole caretaker of her three year old from 6 a.m. to 2 p.m., when her husband worked.  Plaintiff could not work in 2003 because she was "just confused."  AR 303-304.

When questioned by her attorney, Plaintiff explained that she has mania 80 percent of the time and depression 20 percent of the time.  The mania makes her "keep going up and up until [she] can't sleep."  AR 306.  It also sometimes makes her think she is indestructible and she does things she shouldn't.  AR 306-307.  Plaintiff once left her house for six months.  AR 307.

When she is depressed, she can't move and stays in bed.  She can't think straight and has been suicidal.  AR 308.  Of her four hospitalizations, the first one was for two weeks, the second one was for five weeks and the third and fourth were for one week each.  AR 308.

Plaintiff also has an eating disorder and still has problems with bulimia and overeating.  AR 308.

At the conclusion of the hearing, the VE testified that Plaintiff's prior work falls into the light level of exertion.  AR 310.

Medical Record

On April 9, 2001, Plaintiff voluntarily admitted herself to Pacific Shores Hospital because she was acutely depressed, was suicidal and her bulimia was out of control.  Plaintiff was discharged on April 22, 2001, which was before her treatment team felt that she was ready.  During her treatment, she responded well to medication and intensive inpatient food rehabilitation.  On discharge, her affect was constricted and her mood was mildly to moderately depressed.  She had no suicidal ideations and no hallucinations or delusions.  Her insight and judgment were fair.  Plaintiff was diagnosed with major depression and bulimia nervosa.  Her prognosis was guarded.  AR 107-117.

1       Plaintiff returned to Pacific Shores voluntarily on June 18, 2001, for acute depression and

2 out of control bulimia.  Plaintiff was started on a different medication, which she tolerated well.

3 On July 12, 2001, Plaintiff was discharged with diagnoses of major depression and bulimia

4 nervosa and her prognosis was guarded.  AR 118-124.

5       On March 5, 2002, Plaintiff underwent a psychiatric assessment performed by Thomas E.

6 Bittker, M.D.  Plaintiff complained that she was "up and down" every three days and continued

7 to binge and purge daily.  She had been sober for 12 days.  On mental status examination,

8 Plaintiff was alert and cried at times.  Her affect was congruent and she acknowledged a

9 depressed mood with occasional feelings of hopelessness, helplessness and worthlessness.

10 Plaintiff's thoughts were focused and she was able to respond to questions in a goal directed

11 fashion.  She had sufficient insight to appreciate that her upbringing was traumatic (abuse by

12 stepfather) and understood that she was somehow chemically unstable.  AR 125-127.

13       Dr. Bittker diagnosed bipolar disorder, mixed, post-traumatic stress disorder, alcohol

14 abuse and bulimia nervosa.  He noted that Plaintiff represented "something of a dilemma"

15 because the medications she needed to control her bulimia would exacerbate her mood disorder.

16 He recommended that Plaintiff discontinue Prozac and start two new medications.  AR 127.

17       On August 27, 2002, Plaintiff began treatment with Shep Greene, M.D., at the Lassen

18 County Mental Health Department.  Plaintiff reported only a partial benefit from her medications

19 and explained that she continued to experience manic episodes, though they were less intense and

20 less frequent.  On mental status examination, Plaintiff's speech was of normal rate and rhythm

21 and no psychomotor agitation/retardation was noted.  Her mood was labile, yet she displayed a

22 full range of affect.  Plaintiff was alert to person, place and date and her cognitive exam was

23 intact.  Plaintiff's estimated intelligence was above average.  Insight with regard to her condition

24 was good and her judgment was marginal.  He diagnosed Plaintiff with bipolar disorder, not

25 otherwise specified, and bulimia.  Plaintiff was started on a new medication.  AR 173-175.

26       Dr. Greene's notes from October 1, 2002, indicate that Plaintiff's husband called to report

27 that Plaintiff had taken 8 ½ tablets of Klonopin in six hours in an effort to sleep.  Despite the

28

1  medication, Plaintiff was not able to sleep and Dr. Greene recommended that she voluntarily

2  admit herself to break the cycle of mania.  AR 169.

3       On October 17, 2002, Plaintiff was admitted to West Hills Hospital because she was

4  acutely manic.  She was given medication that effectively sedated her and controlled her mood.

5  On discharge, her mood was mildly euphoric to euthymic and her affect was somewhat labile.

6  Her speech was mildly pressured, but corrected from the time of admission.  Thought content and

7  perception were normal and her cognitive capacity was at Plaintiff's baseline.  Insight and

8  judgment were "perhaps mildly impaired," though judgment was deemed to be intact.  Plaintiff

9  was allowed to return to her pre-hospitalization level of activity, but she was told not to operate a

10  motor vehicle.  Her discharge diagnosis was bipolar disorder, manic phase, with psychotic

11  features.  AR 129-130.

12       On October 21, 2002, Plaintiff saw Dr. Greene and appeared less manic, though she

13  reported sleeping 17 hours a day while she was hospitalized.  Dr. Greene increased her

14  medications.  AR 165.

15       Plaintiff saw Dr. Greene on October 28, 2002, and reported that she remained manic.  She

16  did not want to readmit herself to the psychiatric hospital.  Dr. Greene increased Plaintiff's

17  medications.  AR 162.

18       On November 4, 2002, Plaintiff told Dr. Greene that she had been very depressed for the

19  past five days.  She was not feeling manic, however.  Dr. Greene started Plaintiff on an

20  antidepressant and discontinued all other medications.  AR 161.

21       Plaintiff saw Dr. Greene on November 12, 2002, while she was in a mixed

22  hypomanic/depressed state.  Despite this, she was in behavioral control and did not want to be

23  admitted to a psychiatric hospital.  Dr. Greene altered her medications in hopes of reestablishing

24  a depressed state so that antidepressant medication could be introduced without precipitating

25  mania.  AR 160.

26       On November 17, 2002, Plaintiff presented to Dr. Greene in better spirits.  Despite side

27  effects, Plaintiff reported that she was tolerating the medication well.  She no longer felt manic

28  and was less depressed.  AR 158.

1    Plaintiff saw Dr. Greene on November 25, 2002.  She complained of generalized

2  tolerable paresthesias and some hair loss, but felt that her moods were stable.  She denied

3  neurovegetative/cognitive symptoms of depression or symptoms of hypomania/mania.  Plaintiff

4  was in behavioral control and instructed to continue her current care.  AR 156.

5    Group therapy treatment notes from November 26, 2002, indicate that Plaintiff was

6  "totally manic" and could not think or talk straight.  The counselor indicated that she did not

7  think Plaintiff's medications were working.  AR 155.

8    Plaintiff returned to Dr. Greene on December 9, 2002, and reported no manic/hypermanic

9  symptoms and no symptoms of neurovegetative/cognitive depression.  Plaintiff reported no

10  suicidal ideations and was in behavioral control.  She was instructed to continue her medications.

11  AR 153.

12    Plaintiff also saw Dr. Meadows on December 9, 2002.  He noted that her bipolar mood

13  disorder was stabilized.  AR 180.

14    On December 16, 2002, Dr. Meadows noted that Plaintiff was doing better.  She was less

15  anxious and distressed and he determined that her mood was stable.  AR 181.

16    On January 21, 2003, Plaintiff told Dr. Greene that she "does great" during the day but

17  begins to experience depressive symptoms at about 3:00 p.m. every day.  Plaintiff was not

18  experiencing any hypomanic/manic symptoms, and though Plaintiff wished to remain stable, she

19  noted that she "misses" some of the manic symptoms.  Dr. Greene started Plaintiff on an

20  additional medication.  AR 148.

21    On February 20, 2003, Plaintiff saw Dr. Greene and reported manic symptoms lasting 2

22  days, followed by 1-2 days of euthymia, followed by depressive symptoms for another 1-2 days.

23  Dr. Greene altered her dose of Topamax.  AR 146.

24    Plaintiff saw Dr. Greene on March 20, 2003, and reported that she was now experiencing

25  depressive symptoms all day.  She was offered treatment with lithium, but opted to begin

26  Wellbutrin.  AR 145.

27

28

1    On May 8, 2003, Plaintiff saw Dr. Greene and reported that she was doing fairly well,

2  although her depressive symptoms had not decreased.  Dr. Greene increased her Wellbutrin dose.

3  AR 142.

4    Plaintiff returned to Dr. Greene on June 2, 2003.  She did not have any complaints or side

5  effects from her medications and reported that she was doing very well.  Plaintiff was no longer

6  experiencing mania/hypomania or neurovegatative/cognitive symptoms of depression.  Plaintiff

7  felt very stable and balanced with her current medication.  In light of her stability, Dr. Greene

8  transferred her care to her primary care physician, Dr. Meadows.  Plaintiff was instructed to

9  continue her medication and follow up with Dr. Meadows.  AR 139.

10    Plaintiff saw Dr. Meadows on September 16, 2003, and reported that she had been doing

11  fairly well recently.  Dr. Meadows assessed her as stable.  AR 178.

12    On August 28, 2004, a State Agency physician completed a Psychiatric Review

13  Technique form for the period between Plaintiff's alleged approximate onset date of June 2002

14  and her date last insured, March 2003.  The doctor concluded that there was insufficient evidence

15  to determine the severity of Plaintiff's mental impairment.  AR 197.

16    On September 15, 2004, Plaintiff was admitted voluntarily to West Hills Hospital

17  because of mania and auditory hallucinations.  Medication during her stay stabilized her

18  condition.  AR 215-223.

19    On September 27, 2004, Plaintiff saw Mujahid Rasul, M.D., and told him that she was

20  doing fine and that she felt so good that she would use her family physician for medication

21  management.  AR 273.

22    Plaintiff returned to Dr. Rasul on October 19, 2004, and reported that her medication was

23  not working and she was manic.  Her mind was racing and she had rapid cycling.  AR 272.

24    On January 25, 2005, Dr. Rasul completed a Mental Disorder Questionnaire Form.  He

25  first examined Plaintiff on September 8, 2002[3], and last saw her on January 25, 2005.  Plaintiff

26

27        [3] There is a discrepancy in the records as to when Plaintiff began treatment with Dr. Rasul.  On two other

28  occasions, Dr. Rasul indicates that he began seeing Plaintiff in August 2004.  AR 246, 276.  The discrepancy does
   not factor into the Court's decision.

7

1   was currently tense and anxious.  He opined that her intellectual functioning was not impaired,

2   but that her concentration was poor.  Dr. Rasul believed that Plaintiff could do simple chores and

3   relate and communicate effectively.  Her ability to adapt to stresses common in the work

4   environment was impaired and limited.  Plaintiff's prognosis was guarded.  AR 250-253.

5       Plaintiff returned to Dr. Rasul on April 5, 2005.  He noted that she was "reasonably

6   stable" and that her affect was relatively improved.  Although she had periods where she became

7   forgetful, she was content with her current medications.  AR 271.

8       On April 11, 2005, a State Agency physician completed a Psychiatric Review Technique

9   form.  For the period between June 1, 2002, and March 31, 2003, the doctor opined that a

10  residual functional capacity ("RFC") assessment was necessary.  In rating her functional

11  limitations, the doctor found that Plaintiff has moderate difficulties in maintaining social

12  functioning and maintaining concentration, persistence and pace.  The doctor believed that

13  Plaintiff could perform "at least" the detailed and complex she had actually performed with

14  limited public contact.  AR 228-240.

15      Also on April 11, 2005, a State Agency physician completed a Mental Residual

16  Functional Capacity Assessment form.  For the period between June 1, 2002, and March 31,

17  2003, the doctor opined that Plaintiff was moderately limited (1) in her ability to perform

18  activities within a schedule, maintain regular attendance and be punctual within customary

19  tolerances; (2) in her ability to maintain attention and concentration for extended periods; (3) in

20  her ability to complete a normal workday and workweek without interruptions from

21  psychologically based symptoms and to perform at a consistent pace without an unreasonable

22  number and length of rest periods; (4) in her ability to interact appropriately with the public; and

23  (5) if not sober, in her ability to be aware of normal hazards and take appropriate precautions.

24  The doctor further opined that Plaintiff could perform the detailed/complex tasks that she

25  previously performed with reduced contact with the public.  She could relate to

26  supervisors/coworkers and adapt to changes in the work setting.  AR 224-226.

27      On May 26, 2005, Mary Gilbert, Plaintiff's prior social worker, completed an assessment

28  of Plaintiff's ability to perform work related functions.  Her opinions were based on her clinical

1  assessments of Plaintiff from 2002-2003.  Due to bipolar instability, Ms. Gilbert opined that

2  Plaintiff's mental abilities in almost all areas were either fair or poor.  AR 242-244.

3       On July 13, 2005, Dr. Meadows wrote a letter indicating that Plaintiff has been his patient

4  for a number of years.  He explained that Plaintiff suffered from bipolar mood disorder, with

5  rapid cycling, and difficulty with medication control.  She has been unable to hold employment

6  because of the mania and depression and Dr. Meadows opined that Plaintiff should be considered

7  totally disabled.  He did not see any likely positive changes in the future with regard to her ability

8  to work.  AR 245.

9       Plaintiff saw Dr. Rasul on July 14, 2005, and reported that she was doing well on her

10  medications, although they made concentrating difficult.  AR 270.

11       On July 14, 2005, Dr. Rasul completed an assessment of Plaintiff's ability to perform

12  work related functions.  Dr. Rasul opined that due to Plaintiff's bipolar disorder, her mental

13  abilities in almost all areas were either fair or poor.  AR 247-249.

14       On July 15, 2005, Dr. Rasul wrote a letter indicating that Plaintiff has been his patient

15  since August 2004.  Dr. Rasul opined that Plaintiff is disabled and cannot hold a job because of

16  her bipolar disorder.  AR 246.

17       Dr. Rasul noted on September 8, 2005, that Plaintiff was having rapid cycling.  AR 269

18       On November 28, 2005, Dr. Rasul noted that Plaintiff was doing well on her medications

19  though her mind continued to race and she still had a tendency to act out.  She was instructed to

20  continue her current medications.  AR 267.

21       On December 21, 2005, Plaintiff told Dr. Rasul that she was having mood swings.  He

22  told her that she was cycling and noted that her judgment was questionable.  AR 266.

23       Plaintiff returned to Dr. Rasul on February 16, 2006.  She reported having ups and downs,

24  though her affect appeared to have improved.  Her medications were having a limited beneficial

25  effect.  AR 265.

26       Dr. Rasul wrote a letter on October 20, 2006, explaining that Plaintiff had been under his

27  care since August 2004.  She still hears voices that encourage her to commit suicide.  He opined

28  that her bipolar disorder is severe and disabling and prevents her from holding a job.  AR 276.

1    ALJ's Findings

2    The ALJ first noted that Plaintiff alleged disability beginning on June 1, 2002, and that

3    she was insured through March 31, 2003.  She therefore had to establish disability on or before

4    March 31, 2003, the date last insured, to be entitled to disability insurance benefits.  AR 19.

5    The ALJ determined that Plaintiff had the medically determinable impairments of bipolar

6    disorder and bulimia, but after reviewing the medical evidence, he found that these impairments

7    were not severe because they did not significantly limit her ability to perform basic work-related

8    activities through March 31, 2003.  AR 21.

9    Based on this step two finding, the ALJ determined that Plaintiff was not disabled.  AR

10   25.

11   **SCOPE OF REVIEW**

12   Congress has provided a limited scope of judicial review of the Commissioner's decision

13   to deny benefits under the Act.  In reviewing findings of fact with respect to such determinations,

14   the Court must determine whether the decision of the Commissioner is supported by substantial

15   evidence.  42 U.S.C. 405 (g).  Substantial evidence means "more than a mere scintilla,"

16   *Richardson v. Perales*, 402 U.S. 389, 402 (1971), but less than a preponderance.  *Sorenson v.*

17   *Weinberger*, 514 F.2d 1112, 1119, n. 10 (9th Cir. 1975).  It is "such relevant evidence as a

18   reasonable mind might accept as adequate to support a conclusion."  *Richardson*, 402 U.S. at

19   401.  The record as a whole must be considered, weighing both the evidence that supports and

20   the evidence that detracts from the Commissioner's conclusion.  *Jones v. Heckler,* 760 F.2d 993,

21   995 (9th Cir. 1985).  In weighing the evidence and making findings, the Commissioner must

22   apply the proper legal standards.  *E.g.*, *Burkhart v. Bowen*, 856 F.2d 1335, 1338 (9th Cir. 1988).

23   This Court must uphold the Commissioner's determination that the claimant is not disabled if the

24   Secretary applied the proper legal standards, and if the Commissioner's findings are supported by

25   substantial evidence.  *See Sanchez v. Sec'y of Health and Human Serv.*, 812 F.2d 509, 510 (9th

26   Cir. 1987).

27

28

**REVIEW**

In order to qualify for benefits, a claimant must establish that he is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 1382c (a)(3)(A). A claimant must show that he has a physical or mental impairment of such severity that he is not only unable to do her previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. *Quang Van Han v. Bowen*, 882 F.2d 1453, 1456 (9th Cir. 1989). The burden is on the claimant to establish disability. *Terry v. Sullivan*, 903 F.2d 1273, 1275 (9th Cir. 1990).

In an effort to achieve uniformity of decisions, the Commissioner has promulgated regulations which contain, inter alia, a five-step sequential disability evaluation process. 20 C.F.R. §§ 404.1520 (a)-(f), 416.920 (a)-(f) (1994). Applying this process in this case, the ALJ found that Plaintiff: (1) had not engaged in substantial gainful activity during the period June 1, 2002, through March 31, 2003; and (2) did not have an impairment or a combination of impairments that are considered "severe" based on the requirements in the Regulations (20 CFR §§ 416.920(b)).

Here, Plaintiff argues that the ALJ erred by finding that she did not suffer from a severe impairment.

**DISCUSSION**

A.    Step Two Finding

        Plaintiff contends that the ALJ erred by determining, at step two, that her medically determinable impairments of bulimia and bipolar disorder were not severe. AR 21. Specifically, she argues that the medical record supports a finding of severity and that the ALJ erred by not addressing the April 11, 2005, opinion of the State Agency physician.

        Plaintiff bears the burden of proving that she is disabled. *Meanel v. Apfel*, 172 F.3d 1111, 1114 (9th Cir. 1999); 20 C.F.R. § 404.1512. A person is disabled if her impairments are severe and meet the durational requirement of twelve months. 20 C.F.R. §§ 404.1505, 404,1520(a). A

11

1   severe impairment is one that significantly limits the physical or mental ability to perform basic

2   work activities.  20 C.F.R. § 404.1520(c).  Examples of basic work activities include carrying out

3   simple instructions, responding appropriately to usual work situations, dealing with changes in a

4   routine work setting, and performing ordinary physical functions like walking and sitting.  20

5   C.F.R. § 404.1521(b).

6        "An impairment ... may be found not severe only if the evidence establishes a slight

7   abnormality that has no more than a minimal effect on an individual's ability to work."  *Webb v.*

8   *Barnhart*, 433 F.3d 683, 686 (9th Cir.2005) (internal quotation omitted).  The Commissioner has

9   stated that "[i]f an adjudicator is unable to determine clearly the effect of an impairment or

10  combination of impairments on the individual's ability to do basic work activities, the sequential

11  evaluation should not end with the not severe evaluation step."  *Id.*; SSR 85-28.

12       Here, the ALJ found that Plaintiff's bulimia and bipolar disorder did not significantly

13  limit her ability to perform basic work related activities for 12 consecutive months through

14  March 31, 2003, Plaintiff's date last insured.  AR 21.  For the reasons that follow, the Court finds

15  that this determination is not supported by substantial evidence.

16       The Supreme Court has determined that the Commissioner's "severity regulation

17  increases the efficiency and reliability of the evaluation process by identifying at an early stage

18  those claimants whose medical impairments are so slight that it is unlikely they would be found

19  to be disabled even if their age, education, and experience were taken into account."  *Bowen v.*

20  *Yuckert*, 482 U.S. 137, 153 (1987).  In light of this principle, it is well-settled that the step two

21  severity inquiry is "a de minimis screening device [used] to dispose of groundless claims."

22  *Smolen v. Chater*, 80 F.3d 1273, 1290 (9th Cir. 1996); *see also Yuckert v. Bowen*, 841 F.2d 303,

23  306 (9th Cir. 1988) ("Despite the deference usually accorded to the Secretary's application of

24  regulations, numerous appellate courts have imposed a narrow construction upon the severity

25  regulation applied here.").

26       After his review of the relevant medical evidence, the ALJ concluded that "for the period

27  at issue, the claimant has had only brief mental health care, including a 3-day inpatient

28  hospitalization."  AR 23.  He also found that "after adjustments of medications, she has been

1    stable with normal findings for the period at issue." AR 23.  This interpretation, however, is not

2    supported by substantial evidence.  Concluding that Plaintiff had "only brief mental health care,"

3    where there was one hospitalization during the period at issue and more than monthly doctor

4    visits, is absurd.  Moreover, the ALJ's finding that "after adjustments of medication, she has

5    been stable with normal findings" is in direct contravention to his prior observation that

6    Plaintiff's disorder "fluctuated somewhat."  Indeed, fluctuation and periods of stability are a

7    cornerstone of many mental illnesses, but "stability" is a relative term and by no means equates

8    to a finding that Plaintiff's impairments have only a "slight abnormality that has no more than a

9    minimal effect" on her ability to work.

10       As to the 12 consecutive month issue, Plaintiff alleged an onset date of June 1, 2002.  The

11   first notation that Plaintiff was doing "well," rather than just appearing "stable," was on June 2,

12   2003.  At the very least, then, the 12 month period is satisfied using these dates.

13       The ALJ also erred in his treatment of medical opinions.  He correctly notes that there are

14   no treating physician or consultive examiner opinions for the relevant period, which begs the

15   question as to whether Plaintiff's treating sources should have been recontacted.  Nonetheless,

16   there were two State Agency physician opinions that were wholly ignored.  On August 28, 2004,

17   a State Agency physician reviewed the records for the relevant periods and concluded that there

18   was insufficient evidence to determine severity.  AR 197.  On April 11, 2005, a State Agency

19   physician opined that a residual functional capacity ("RFC") assessment *was necessary*.  AR

20   228-240.  Pursuant to SSR 96-6p, an ALJ may not ignore the opinions of State Agency

21   physicians and must explain the weight given to the opinions.  While the first opinion of

22   insufficient evidence may not have been definitive and may not have warranted discussion, it

23   certainly suggests that additional information may have been necessary and demonstrates a

24   hesitancy to declare Plaintiff's impairments non-severe.  More importantly, the ALJ completely

25   ignored the April 11, 2005, which specifically states that an RFC assessment is necessary.

26       Defendant urges the Court to find this harmless error, arguing that the State Agency's

27   opinion that Plaintiff was not significantly limited in certain areas compels a finding of non-

28   severity.  Specifically, Defendant cites the State Agency physician's finding that Plaintiff was not

1    significantly limited in understanding, remembering and carrying out simple instructions, using

2    judgment, responding appropriately to supervision, co-workers and other work situations, and in

3    dealing with routine changes in the work setting.  Defendant argues that 20 C.F.R. §

4    404.1521(b)(3)-(6), which sets forth these abilities as examples of basic work activities, compels

5    a finding that Plaintiff's mental impairment is non-severe.  Defendant's contention is incorrect.

6    Section 404.1521(b)(3)-(6) simply sets forth examples of basic work activities, including

7    understanding, carrying out, and remembering simple instructions, use of judgment, responding

8    appropriately to supervision, co-workers and usual work situations, and dealing with changes in a

9    routine work setting.  The list is not exhaustive and is not a directive on the analysis of a mental

10   impairment.

11           In fact, in the same form relied on by Defendant, the State Agency physician goes on to

12   find Plaintiff moderately limited (1) in her ability to perform activities within a schedule,

13   maintain regular attendance and be punctual within customary tolerances; (2) in her ability to

14   maintain attention and concentration for extended periods; (3) in her ability to complete a normal

15   workday and workweek without interruptions from psychologically based symptoms and to

16   perform at a consistent pace without an unreasonable number and length of rest periods; (4) in

17   her ability to interact appropriately with the public; and (5) if not sober, in her ability to be aware

18   of normal hazards and take appropriate precautions.  AR 224-226.  It is certainly conceivable that

19   Plaintiff's bipolar disorder, which the ALJ recognizes fluctuates, may cause limitations in

20   Plaintiff's ability to concentrate and maintain appropriate judgment, and even in her ability to

21   complete a work day or workweek without unacceptable absences.  Though Plaintiff may not be

22   significantly limited in certain areas, she is moderately limited in other areas that are just as

23   important to her ability to perform basic work activities.  These moderate limitations are likely

24   the reason behind the State Agency physician's conclusion that an RFC assessment was

25   necessary.

26           Based on the ALJ's improper analysis of the medical record and opinions, the Court finds

27   that he erred by concluding the sequential evaluation process at step two.  The medical evidence

28   did not "clearly establish" non-severity and Plaintiff's claim should not have been disposed of at

1   this threshold step.  SSR 85-28.  While the Court is aware that the Commissioner may ultimately

2   determine that Plaintiff is not disabled, such a decision must be based on a proper sequential

3   analysis.

4   B.      Remand

5          Section 405(g) of Title 42 of the United States Code provides: "the court shall have the

6   power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying,

7   or reversing the decision of the Secretary, with or without remanding the cause for a rehearing."

8   In social security cases, the decision to remand to the Commissioner for further proceedings or

9   simply to award benefits is within the discretion of the court.  *McAllister v. Sullivan*, 888 F.2d

10  599, 603 (9th Cir. 1989).  "If additional proceedings can remedy defects in the original

11  administrative proceedings, a social security case should be remanded.  Where, however, a

12  rehearing would simply delay receipt of benefits, reversal and an award of benefits is

13  appropriate."  *Id.* (citation omitted); *see also Varney v. Secretary of Health & Human Serv.*, 859

14  F.2d 1396, 1399 (9th Cir.1988) ("Generally, we direct the award of benefits in cases where no

15  useful purpose would be served by further administrative proceedings, or where the record has

16  been thoroughly developed.").

17         Here, the Court finds that remand for further proceedings is proper to allow the ALJ to

18  make a disability finding based on a complete sequential evaluation.  In doing so, the ALJ should

19  consider whether recontacting Plaintiff's treating sources during the relevant period would assist

20  in his analysis.

21                                      **CONCLUSION**

22         Based on the foregoing, the Court finds that the ALJ's decision is not supported by

23  substantial evidence and is therefore REVERSED and the case is REMANDED to the ALJ for

24

25

26

27

28

1   further proceedings consistent with this opinion.  The Clerk of this Court is DIRECTED to enter

2   judgment in favor of Plaintiff Jennifer C. Peterson and against Defendant Michael J. Astrue,

3   Commissioner of Social Security.

4

5        IT IS SO ORDERED.

6     **Dated:**   **August 2, 2009**                    **/s/ Dennis L. Beck**
                                                    UNITED STATES MAGISTRATE JUDGE

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

16